IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| LEROY SANDERS, ET AL. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| vs. | * | No. 4:08CV00222 SWW |
| | * | |
| KOHLER COMPANY, | * | |
| | * | |
| Defendant. | * | |

**Memorandum Opinion and Order**

Before the Court is defendant's motion for partial summary judgment to which plaintiffs responded with their own motion for summary judgment. For the reasons stated below, the Court grants defendant's motion.

**Background**

Defendant Kohler Company ("Kohler") operates a plant in Searcy, Arkansas, which manufactures bathroom and kitchen products. In 2006, over ninety-five percent of the employees at the plant were members of the UAW Local 1000. Kohler and the union were parties to a Collective Bargaining Agreement that expired on December 5, 2006. On December 9, 2006, the union voted to go on strike. On February 12, 2007, Kohler began hiring replacement workers to fill the positions vacated by the 247 striking union members.[1] On or about March 6, 2008, Kohler

---

[1] Between April 17, 2007, and November 14, 2007, the UAW and their individual members filed nine separate unfair labor practice charges against Kohler with the National Labor Relations Board ("NLRB"). On December 27, 2007, the local Regional Director of the NLRB filed a consolidated complaint against Kohler. The complaint alleged that the UAW's strike had been converted from an economic strike to an unfair labor practice strike as of February 2007. The Regional Director filed an amended consolidated complaint on January 11, 2008. The administrative law judge ("ALJ") assigned to the matter scheduled a hearing for February 4, 2008. At the February 2008 hearing, the ALJ continued the matter to allow the parties more time to negotiate a settlement.

and the UAW settled all disputes with an agreement to, among others things, return 103 of the striking workers to work at the Searcy facility.

On March 6, 2008, Kohler terminated all 123 replacement workers it had hired, including the 111 plaintiffs herein. Their positions were filled as of March 11, 2008, by 103 workers who had been on strike. On March 20, 2008, plaintiffs filed a complaint in federal court, and on March 26, 2008, filed an amended complaint. Plaintiffs allege Kohler violated the Workers Adjustment Retraining Notification Act ("WARN Act), 29 U.S.C. § 2101 *et seq.* by failing to give them notice of their termination. They also allege breach of contract, fraud, unjust enrichment, promissory estoppel, and civil conspiracy.

Kohler moves for summary judgment on plaintiffs' WARN Act claim, arguing plaintiffs were not entitled to notice because they were not discharged in conjunction with a "mass layoff" as defined in the Act. Plaintiffs responded in opposition and filed their own motion for summary judgment. Kohler filed a reply to the response and a response to plaintiffs' motion, and plaintiffs filed a reply to Kohler's response.

**Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some

2

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 587 (quoting Fed. R. Civ. P. 56(e)). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The filing of cross-motions does not concede the absence of a triable issue of fact. *Jacobson v. Maryland Cas. Co.,* 336 F.2d 72, 75 (8th Cir. 1964).

**Discussion**

The WARN Act requires an employer to provide written notice to employees at least sixty days before a plant closing or mass layoff. 29 U.S.C. § 2102(a)(1).[2] A "mass layoff" is defined as a "reduction in force which - (A) is not the result of a plant closing; and (B) results in an employment loss at a single site of employment during any 30-day period" of either: 1) 33% of the workforce provided such layoff affects at least 50 employees; or 2) any percentage of the workforce if at least 500 employees are affected. 29 U.S.C. § 2101(a)(3).

---

[2]The purpose of the notice requirement is to provide "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a).

3

Kohler argues plaintiffs are not entitled to notice under the WARN Act because the termination of the 103 replacement workers did not happen in the context of a reduction in force. Kohler contends the WARN Act does not require 60 days notice for all layoffs or for all layoffs that affect large groups of employees. Instead, the WARN Act explicitly requires the layoff be a "reduction in force" for the notice provisions to apply, and then only if the numerosity threshold is met. *See Smullin v. Mity Enter., Inc.,* 420 F.3d 836,838 (8th Cir. 2005)("A 'mass layoff' requires a reduction in force..."); *United Steel v. Ainsworth Engineered (USA), LLC*, 2008 WL 4857905, at *2 (D. Minn. Nov. 10, 2008)(a 'mass layoff' "is defined as a 'reduction in force'").

The WARN Act does not define "reduction in force," but Kohler asserts that the ordinary meaning is that an employer lays off employees to eliminate positions. If the position is not eliminated and a replacement is hired, the employer has not reduced its workforce.[3] In *Oil, Chemical and Atomic Workers Int'l Union v. RMI Titanium Co.,* 199 F.3d 881 (6th Cir. 2000), a WARN Act case, the Sixth Circuit recognized that when a group of employees are laid off but their positions are not eliminated, such a situation is not a "reduction in force" and therefore those employees do not count toward the numerosity provisions for a "mass layoff" under the WARN Act. In *RMI Titanium*, the majority of the employees were laid off due to budget concerns, they were not replaced, and hence their positions were eliminated. The parties did not dispute that these employees counted toward the number required to trigger a "mass layoff" under the WARN Act. They did dispute whether a group of 27 other employees should count toward the required number. These 27 employees were originally in a layoff status, had returned to work to cover for

---

[3]The Eighth Circuit has not addressed the definition of "reduction in force" in the context of a WARN Act but has discussed reductions in force in age discrimination cases. *See Ramlet v. E.F. Johnson, Co.,* 507 F.3d 1149, 1154 (8th Cir. 2007); *Gaworski v. ITT Commercial Finance Corp.,* 17 F.3d 1104, 1109 (8th Cir. 1994).

more senior employees who were participating in a voluntary layoff program, and then returned to layoff status when the more senior employees returned to work after the voluntary layoff. Affirming the trial court, the Sixth Circuit held that these 27 employees should not be counted toward the number required to trigger a "mass layoff," when they went on layoff because this particular action involved no elimination of positions and hence no reduction in force. *Id* at 885-86.[4]

Kohler argues that the WARN Act on its face does not require any notice to plaintiffs because the definition of a "mass layoff" was not met. Kohler states the number of employees employed at the Searcy plant on March 6, 2008, was 153 (123 replacement workers and 30 management personnel). All but twenty of the replacement workers' positions were filled with strikers who returned to work by March 11, 2008. Thus, there are two categories of replacement worker positions, the 103 positions that were filled with returning strikers and the twenty that were not.

Kohler asserts that because the 103 positions were not eliminated, these employees do not count toward the threshold numerosity requirements of a "mass layoff." Likewise, the 103 were not discharged as a result of a "reduction in force." As to the 20 replacement workers who were not replaced, Kohler contends this is not a sufficient number of affected employees to trigger the WARN Act. They constituted only 13% (20/153) of the workforce. Moreover, a reduction in force must result in the discharge of a least 50 employees to trigger a "mass layoff."

---

[4]The Sixth Circuit cited an age discrimination case in determining the meaning of "reduction in force" under the WARN Act. The court quoted *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) in holding that an employee is not eliminated as a part of a workforce reduction when he is replaced after his discharge. *RMI Titanium,* 199 F.3d at 885.

Plaintiffs dispute Kohler's assertion that it had only 153 positions at its Searcy plant as of March 6, 2008. They argue that Kohler created new positions when it hired replacement workers and the striking workers positions remained open during the strike.[5] Thus, on March 6, 2008, when plaintiffs were discharged, Kohler had 370 positions in addition to management personnel. In support of their theory, plaintiffs point out that in an affidavit, Jerry Stone, the plant manager, referred to the 103 strikers who were to be returned to employment under the settlement agreement as "striking employees." Def's. Mot. Part. Summ. J. [doc. # 27], Ex. 1. Plaintiffs also refer to a roster Kohler provided titled "Searcy Employees to 03/07/2008" as proof that Kohler considered 388 people as employees as of March 7, 2008. According to plaintiffs, the roster also reflects that 148 people were terminated between March 7-31, 2008. Thus, for purposes of the WARN Act, over 50 full time employees lost their employment, and the layoff resulted in the loss of 38.1% of the workforce during this period.

In addition, plaintiffs assert that two Searcy plant seniority lists demonstrate that Kohler considered the striking union workers employees even during the term of the strike. One exhibit dated December 15, 2006, lists the names of the striking union members. *See* Pls.' Supp. Materials in Supp. of Resp. & Cross-Mot. Summ. J. [doc. # 68], Ex. 1. A second seniority list dated June 21, 2007, lists both the striking union members and the replacement workers. *Id.,* Ex. 2.

---

[5]Plaintiffs contend the strikers' positions remained open because under the terms of the strike, if any union member made an unconditional offer to return to work, Kohler would have had to allow him to return. Plus, Kohler took the position that the strike was an economic strike and, therefore, after a period of time, told the replacement workers they were "permanent replacements." In response to plaintiffs' assertion that Kohler must have considered the strikers "employees" because they were not given COBRA notices when they went on strike, *see* Pls.' Br. [doc. 52] at 15, Kohler submits evidence that it did issue COBRA notices shortly after the strike began. *See* Def's. Br. [doc. 60], Ex. A.

Plaintiffs further argue that despite the union members' status as "striking employees," their positions are still to be considered in determining whether a "reduction in force" occurred. As noted, prior to the strike, the workforce consisted of 247 union members and management personnel; after the replacement workers were terminated, the workforce consisted of 103 of the returning strikers plus management personnel. Plaintiffs argue that the 124 striker positions that were not filled with replacement workers after the strike plus the 20 replacement workers who were not replaced by strikers means a loss of 144 employees and the elimination of over 58% (144 of 247) of the workforce.

Plaintiffs urge the Court not to follow the Sixth Circuit decision, arguing the facts are distinguishable, most notably because Kohler told the replacement workers that they were permanent employees whereas the laid-off employees in *RMI Titanium* were clear about their status in a voluntary leave program. Also, the *RMI Titanium* workers had already been laid off and their positions eliminated during layoffs one year earlier. Here, plaintiffs argue, the union strikers were still considered employees as reflected by Stone's statement, the roster provided by Kohler, and the seniority lists. Plaintiffs argue the Court should adopt the dissent's approach in *RMI Titanium*, which stated:

> The use of 'reduction in force' in the statute is solely a means of describing a significant elimination of jobs '*which ... is not the result of a plant closing.*' The resulting effect of this reduction in force is separately described under the statute as the number and percent of employees experiencing an employment loss.
>
> As a result, even accepting that the term 'reduction in force' requires - as the majority holds - that actual job elimination must occur in order for a 'mass layoff' to occur - no dispute exists that a reduction in force has occurred during the layoffs at RMI in the summer of 1991. At least 87 employees undisputedly lost their positions and were not replaced during the economic downturn experienced by RMI. Thus, a 'reduction in force' unquestionably has occurred. The remaining issue is whether that reduction in force 'results in an employment loss for ... at least

> 33 percent of the employees....' In other words, as the statute unambiguously states, the definition does not require a reduction in force of 33 percent of the positions. It requires a reduction in force resulting in an employment loss for 33 percent of the employees.
>
> . . .
>
> In addition, as the majority notes, the legislative history does not discuss or define 'reduction in force' or mention the elimination of 'positions.' That same history, however, clearly reinforces the conclusion that Congress intended a mass layoff to be determined by counting the amount and percentage of employment loss and employees affected, not by counting the amount or percentage of reduction in force or whether positions have been eliminated.

199 F.3d at 894-95. Plaintiffs argue that the "50-employee/thirty-three percent of the employees" language is included only as a qualifier of the "employment loss" requirement of the statute, not the "reduction in force" language at the beginning of the statute to which no qualifiers are attached. Plaintiffs argue that Kohler's concession that a reduction in force occurred [20 replacement worker were not replaced], and the undisputed facts that more than 50 employees and 33 percent of the workforce suffered an employment loss, demonstrate the WARN Act applies, and Kohler failed to provide the required notice.

Kohler argues that the strikers were not employees when they were on strike and not working. First, Kohler argues the strikers do not meet the legal definition of "employee." While the WARN Act does not define "employee," federal case law interpreting the term in the context of the WARN Act has adopted a standard, treatise definition. In *Damron v. Rob Fork Mining Corp.,* 945 F.2d 121, 123 (6th Cir. 1991), the Sixth Circuit used the definition of employee in *Black's Law Dictionary*, which defines an employee as "one who works for an employer; a person working for salary or wages," and also cited 30 C.J.S. *Employee* § 673 (1965), which defines "employee" as "one who performs services for another for hire." 94 F.2d 123 at n.4. Kohler

argues the strikers do not meet this ordinary definition of "employee" because they were not performing any services for Kohler while on strike and not receiving any wages while on strike.

Second, Kohler contends plaintiffs' theory that the strikers were employees while on strike and their contention that the replacements were hired for permanent, full-time positions to replace the striking union workers, *see* Compl. ¶9, do not mesh because if the replacement workers were considered permanent replacements, they had to be replacing some other employees, and replacing these other employees permanently. Logically, therefore, if the strikers were permanently replaced, then they were no longer employees. Kohler argues it is clear that the replacement workers were hired to fill the labor positions on the floor formerly held by the strikers, and that Kohler did not create new positions for the replacement workers.

Kohler argues that plaintiffs' reliance on the statement in Stone's affidavit and the roster do not help their theory that the strikers were employees of Kohler. Kohler explains that the roster, which was prepared for this litigation, well after March 6, 2008, lists all employees hired from the opening of the plant until March 6, 2008. The roster includes strikers without a termination/retirement date because they were active employees on the date the roster was prepared. Many strikers do have a termination/retirement date because they were not active employees when the roster was prepared. Contrary to plaintiffs' assertion, the roster does not characterize the strikers as "active employees" on March 6, 2008.

Kohler further contends that even accepting plaintiffs' theory that the strikers were still part of the workforce, an insufficient number of "employees" suffered an "employment loss" to trigger a "mass layoff." Plaintiffs' math assumes that 148 "employees" suffered an employment loss, or 38.1% of the workforce, under its theory that there were 388 total employees in the

"workforce" on March 6, 2008. Included in the 148 are 32 strikers, whose employment did not end on March 7, 2008, after the strike settled. Kohler argues, however, that the 32 strikers do not count for purposes of determining if a "mass layoff" occurred because they did not suffer an "employment loss."

An employment loss is defined as "an employment termination, *other than* a discharge for cause, *voluntary departure*, or retirement." 29 U.S.C. § 2101(a)(6)(A) (emphasis added). According to the evidence, the 32 strikers departed voluntarily, therefore, they did not suffer an "employment loss." The evidence shows 31 strikers either officially resigned or abandoned their position by not reporting to work after Kohler attempted to reach them regarding their reinstatement, and one was discharged for excessive absenteeism. Def's Br. in Reply/Resp. [doc. 60], Exs. B and C; Def's. Supp. Br. [doc. 66], Ex. 1. Once these 32 individuals are excluded, the 33% threshold was not met. This is true even accepting plaintiffs' theory that the total number of "active employees" should include the strikers.

Kohler urges the Court to adopt the majority opinion in *RMI Titanium*, arguing the dissent bases its attack on the incorrect premise that the majority held a reduction in force can only occur when an employee's position is entirely eliminated. The facts in *RMI Titanium* involved the elimination of positions. However, Kohler agrees that an employer could reduce its workforce by cutting hours, and the more reasonable interpretation of a "reduction in force" is simply when an employer reduces the workforce in any manner and does not replace that part of the workforce. Kohler disagrees with plaintiffs' argument that the "50 employee/33% workforce" prong only modifies the "employment loss" prong and not the "reduction in force" requirement. Under plaintiffs' reading, if any reduction in force occurred, the WARN Act notice provision would

always be triggered if the requisite number of employees suffered an employment loss, even if the overwhelming majority of these employees did not suffer an employment loss in the context of a reduction in force. Kohler also asserts that the inclusion of "reduction in force" in the definition of a "mass layoff" recognizes that the ordinary meaning and purpose of a layoff is to reduce costs or account for decreased demand, and hiring an employee to replace an employee who was just "laid off" is inconsistent with that meaning.[6] Here, the majority of the plaintiffs were not "laid off" to cut Kohler's labor costs or to account for decreased demand, but were discharged to create open spaces for the strikers who were returning to work as a result of the settlement.

Plaintiffs counter that the strikers were Kohler "employees" during the strike, and 33% of Kohler's "active employees" experienced an "employment loss" effective March 7, 2008. The WARN Act specifically states:

> Workers on temporary layoff or on leave who have a reasonable expectation of recall are counted as employees. An employee has a 'reasonable expectation of recall' when he/she understands, through notification or through industry practice, that his/her employment with the employer has been temporarily interrupted and that he/she will be recalled to the same or similar job.

20 C.F.R. § 639.3(a)(1). Plaintiffs argue that because there is evidence that the strikers would have anticipated, based on past strikes, that they would be recalled to their positions as soon as the strike ended, they were considered employees during the term of the strike. Plaintiffs further contend that if the strikers were not "active employees" as of March 7, 2008, then the number of "active employees" was 153 (123 replacement workers and 30 management personnel), and effective March 7, 2008, 123 of the 153 "active employees" were terminated. Thus, as of March 7, 2008, over 80% suffered an employment loss. The fact that 103 striking workers eventually

---

[6]The WARN Act specifically exempts mass layoffs if such layoff constitutes a strike. 29 U.S.C. § 2103(2).

11

were recalled is inconsequential because they were not recalled until March 11, 2008, and according to Kohler's logic, they cannot be counted in determining the WARN Act's applicability to plaintiffs' terminations which had already been effected.

Alternatively, plaintiffs argue that because Kohler settled its disputes with the union before March 7, 2008, when plaintiffs were terminated and, therefore, had agreed to return 103 strikers to its workforce, Kohler's workforce immediately prior to plaintiffs' termination was 256 employees (153 plus 103 strikers). When Kohler then terminated 123 employees effective March 7, 2008, Kohler effectively eliminated 48% of its workforce, and the WARN Act was applicable.

The Court finds persuasive the reasoning in *RMI Titanium* that replaced employees do not count toward the requisite number of employees to trigger the WARN Act. The statute requires that the reduction in force result in the requisite employment loss. Specifically, it states a mass layoff is a "reduction in force which - (A) is not the result of a plant closing; and (B) results in an "employment loss" of a specified number of employees. 29 U.S.C. § 2101(a)(3). When the employment losses do not result from a reduction in force, they do not count toward the requisite number of affected employees. Here, 103 of the 123 employment losses did not result from a reduction in force as those employees were replaced. Thus, the reduction in force resulting in the termination of 20 replacement workers does not trigger the notice requirements of the WARN Act.

The Court further finds no credible evidence to support plaintiffs' theory that Kohler created 123 new positions when it hired replacement workers. Further, the Court finds that even if the striking workers are considered part of the workforce, plaintiffs cannot demonstrate that a requisite number of "employees" suffered an "employment loss" to trigger the WARN Act notice provisions. The evidence reflects that 32 strikers either voluntarily left their positions or were discharged for cause. Even under plaintiffs' contention that Kohler's workforce was 388 on

March 6, 2008, and a total of 148 employees suffered an employment loss, once these 32 strikers are subtracted, that leaves a total of 116, 29.9% of the total 388. That is insufficient to trigger the WARN Act notice provision.

### State Law Claims

In addition to their WARN Act claim, plaintiffs assert state law claims of wrongful termination, fraud, unjust enrichment, breach of contract, promissory estoppel, and civil conspiracy. They allege the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. First Am. Compl. at ¶¶ 1 & 2.

Title 28 United States Code Section 1367 (c)(3) permits a district court to decline supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction . . ." 28 U.S.C. § 1367(c)(3). However, in *Adair v. Burgett,* 210 F.3d 378, 2000 WL 485256 (8th Cir. 2000)(unpublished per curiam), the Eighth Circuit affirmed the grant of summary judgment dismissing plaintiff's constitutional claims. With regard to the state claim, however, the Eighth Circuit, quoting *Birchem v. Knights of Columbus*, 116 F.3d 310, 314 (8th Cir. 1997), stated: "'when federal and state claims are joined and the federal claims are dismissed on motion for summary judgment, the pendent state law claims are dismissed without prejudice to avoid [n]eedless decisions of state law . . . as a matter of comity.'" Although §1367 and *Birchem* appear to confer discretion on the Court to retain jurisdiction of plaintiffs' state law claims, the language of *Adair* is unequivocal.[7] Accordingly, the Court finds that plaintiffs' state law claims should be dismissed without prejudice.

---

[7] In the exercise of discretion, the Court would decline supplemental jurisdiction in this case. Even though significant federal judicial resources have been expended in dealing with discovery, plaintiffs can use the evidence in state court litigation.

**Conclusion**

For the reasons stated above, the Court finds defendant is entitled to summary judgment on the WARN Act claim. Defendant's motion [docket entry 27] is granted. Plaintiffs' cross motion for summary judgment is denied. Plaintiffs' WARN Act claim is dismissed. Plaintiffs' state law claims are dismissed without prejudice.

DATED this 18th day of March, 2010.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE